A93A0342. CARVER v. KINNETT.
A93A0343. SNOW v. KINNETT.
(434 SE2d 136)

COOPER, Judge.

Appellee brought this action to recover for injuries sustained when the truck and trailer he was driving collided with a herd of cows, allegedly owned by appellants, Joel Carver and Ronnie Snow, which were in the right-of-way. Appellee contends appellants were negligent in maintaining the proper fencing to keep their cows off the right-of-way. At the end of appellee's case, appellant Carver's motion for directed verdict was denied, and after appellant Snow rested his case, his motion for directed verdict was also denied. A jury trial resulted in a verdict for appellee in the amount of $39,586.48. The trial court denied appellants' motions for judgment n.o.v., or in the alternative, motions for new trial, and this appeal followed.

1. Appellants contend the trial court erred in denying their motions for judgment n.o.v., or in the alternative, motions for new trial because there was no evidence of their negligence. " '(A) motion for judgment n.o.v. may be granted only when, without weighing the credibility of the evidence there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence, or there is insufficient evidence to make a "one way" verdict proper,

judgment n.o.v. should not be awarded. In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict. And this approach governs the actions of appellate courts as well as trial courts.' . . . [Cit.]" *Austin v. Kaufman*, 203 Ga. App. 704, 707 (1) (417 SE2d 660) (1992).

Viewed in the light most favorable to appellee, the evidence reveals that appellee was traveling on Highway 268 at night when he collided with a herd of approximately 20-25 cows which were situated in the right-of-way and on the shoulders of the road. Appellee suffered a sprained back, and three of the cows were killed upon impact. Both Carver and Snow admitted their cows had strayed from their properties on numerous prior occasions in addition to the night of the accident. Shortly after his arrival at the scene of the accident, Carver's son, Terry, drove all the cows into Carver's pasture. Witnesses testified that Carver's cows weighed at least 700 pounds and had yellow or red tags on their ears and that Snow's cows were considerably smaller with no tags. Terry Carver testified that at least one of the dead cows looked like one of his father's cows. However, none of the people who saw the dead cows and testified at trial saw tags in the cows' ears. Upon his arrival at the accident site on the following morning, Snow claimed ownership of the three dead cows. He then proceeded to drive 13 cows from Carver's pasture back to his property. At trial, contrary to his initial admission of ownership of the dead cows, Snow testified that after he drove the cows back onto his property, he determined that no cows were missing from his herd of 18 or 19 after the accident. Snow also testified that he inspected his fences once a week or every two weeks and that on the morning following the accident, he discovered that a chinaberry tree had fallen across a portion of his fence which he claimed enabled his cows to escape on the night of the accident. Snow testified that the tree had fallen on the night of the accident. However, he did not see the tree fall, and he admitted that there were no unusual weather conditions that night.

Carver testified that he was out of town on the night of the accident; that upon his return home, he determined that none of his cows was missing; that he inspected his fences at least once a week; and that after the accident, he discovered that his cows had torn down a portion of his fence. Carver indicated that it appeared as though cows on both sides of the fence had been fighting and in the process tore the fence down.

Appellee offered the testimony of James Spires as proof that Carver and Snow were negligent in maintaining the fences on their properties. Spires testified that although the height of a fence may vary, depending on the size of the cows one has, a fence should typically be between 55 and 58 inches tall to prevent a cow from placing

its head over or through a fence; that once a cow determines that its head can fit through a fence, it is likely to attempt to walk through the fence; that while the barbed wire across the top of Carver's fence was fairly tight, the mesh wire underneath sagged, making it possible for a cow to get its head under the barbed wire and over the fence; and that the height of the fence up to the barbed. wire was only approximately 46 inches. When asked whether Carver's fence was adequate to contain the cows, Spires opined that it would be questionable because the fence was not tall enough, the mesh was not tight enough, and the mesh did not extend to meet the barbed wire. He indicated that it appeared as though a cow had already placed its head through the fence. On cross-examination, Spires admitted seeing Carver's fence for the first time six months after the accident; however, there was no evidence that the fence looked any differently at the time of the accident.

Regarding Snow's fence, Spires testified that it was in worse shape than Carver's fence; that it was inadequate to keep the cows in; that the fence showed years of wear; that the fence was broken in certain places; that trees had grown into the fence; and that it appeared as though parts of the fence had been abandoned. In addition, the evidence reveals Snow had received numerous complaints in the past regarding the escape of his cows and that prior to the accident at issue, one of Snow's cows escaped and was hit by Carver.

" 'The mere fact that livestock is running at large permits an inference that the owner is negligent in permitting the livestock to stray; but when the owner introduces evidence that he has exercised ordinary care in the maintenance of the stock, that permissible inference disappears.' [Cits.] For the evidence to require a verdict for the defendant it must demand a finding that he was not negligent in any respect. A jury question reappears in the case where, although evidence of facts showing ordinary care on his part have been introduced, other facts would support a contrary inference." *Wilkins v. Beverly*, 124 Ga. App. 842 (186 SE2d 436) (1971). Carver and Snow suggested non-negligent explanations as to how their cows escaped from their properties; however, these explanations were not based on their personal knowledge of the escapes "but constituted only [appellants'] opinion[s] based on [their] examination[s] of the fence[s] and the [cows] after the collision had occurred. '(A)ny witness may give his opinion if he testifies to the facts on which such opinion is based . . . , but in no case where the facts are before the trior of facts can it be said that a [verdict] is demanded . . . based upon the opinions expressed, for the trior of facts may arrive at a different conclusion based upon the evidence introduced and is not bound by the opinion testimony. (Cits.)" *Nichols v. Frey*, 185 Ga. App. 829, 830 (366 SE2d 212) (1988). There was evidence of appellants' negligence in maintain-

ing their fences other than the mere fact that the cows strayed in the road. The jury was obligated to weigh this evidence and determine the credibility of the witnesses. *Tucker v. Love*, 200 Ga. App. 408, 409 (2) (408 SE2d 182) (1991). We cannot conclude that the evidence demanded a verdict for appellants. Accordingly, the trial court did not err in denying appellants' motions for judgment n.o.v. *Austin*, supra; *Green v. Heard Milling Co.*, 119 Ga. App. 116 (1) (166 SE2d 408) (1969).

2. Appellants next enumerate as error the trial court's refusal to allow appellants to introduce evidence that appellee received $175 per week in workers' compensation benefits for the purpose of impeachment after appellee testified at trial that as a result of the accident, he had no alternative but to go on food stamps. Appellants contend that appellee's unrebutted testimony was highly prejudicial and left the jury with a biased impression of appellee's true financial condition. The evidence before the jury indicated that appellee was married with three children; that he was unable to work due to the accident for thirty-eight weeks; that prior to the accident he earned $528 per week; that he exhausted his savings; and that he was on food stamps for approximately one year. Appellants point to no testimony in which appellee represented that he had no income or showed that he defrauded the government in obtaining food stamps. Thus, the trial court held that the evidence regarding appellee's receipt of workers' compensation was not proper impeachment testimony. The court concluded that because appellee qualified for food stamps and there was no evidence that he defrauded the government, the evidence of his receipt of other income did not negate the fact that he was poor enough to qualify for food stamps. We agree. Thus, the trial court did not abuse its discretion in refusing to allow the admission of the evidence.

3. Appellant Carver also enumerates as error the admission of a syringe and needle which appellee testified were similar to syringes and needles used in the treatment of his back. Carver argues that the admission of the needle was highly prejudicial and inflammatory because the evidence was admitted without a proper foundation, was not the actual equipment used in his treatment and had no probative value. " ' "Admission or exclusion of evidence which is objected to on the ground of relevancy lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." ' [Cit.]" *Candler v. Davis & Upchurch*, 204 Ga. App. 167, 170 (4a) (419 SE2d 69) (1992).

Appellee sought to introduce the syringe and needle to demonstrate the procedures he endured to alleviate the pain which resulted from his injury. At a pretrial hearing, the trial court granted Carver's motion in limine to restrict the admission of the evidence during the

trial unless appellants introduced evidence that appellee was a malingerer. However, despite Carver's trial attorney statement that such evidence would not be introduced, testimony was elicited from witnesses which could cause the jury to question whether appellee actually sustained an injury in the accident or was feigning injury or if appellee suffered an injury, whether that injury was minor. Appellee gave extensive testimony regarding his medical treatment which included a description of the injections in his back to attempt to discover the source of his discomfort and to alleviate his pain. Appellee testified that a series of myelograms and steroid epidural injections were performed. He recounted each injection and the after effects. At the end of his testimony under direct examination, appellant testified that a particular syringe and needle which were offered for admission were not the actual equipment used in his treatment but were identical to the syringes and needles which were used in the various procedures he endured. Having undergone at least two myelograms and four steroid epidural injections, appellee was able to state with some degree of reliability that the syringe and needle offered for admission were similar to the ones used in his treatment, and that testimony provided a sufficient foundation for their introduction as demonstrative evidence inasmuch as pain and suffering was at issue in this case. Therefore, we find no abuse of discretion in the admission of this evidence.

*Judgments affirmed. McMurray, P. J., and Beasley, P. J., concur.*

DECIDED JULY 16, 1993.

*Andrew, Threlkeld & Thompson, Reid A. Threlkeld, Richard S. Thompson*, for Carver.
*Preston & Preston, Robert H. Preston*, for Snow.
*Miles, Baker & Morris, Keith M. Morris, Fred R. Kopp*, for Kinnett.